THE FIDELITY AND CASUALTY COMPANY OF NEW YORK *v.* DONALD W. McNAMARA

(No. 9688)

Submitted April 10, 1945. Decided June 5, 1945.

*Joseph M. Sanders,* for plaintiff in error.
*Bailey and Shannon,* for defendant in error.

RILEY, JUDGE:

The Fidelity and Casualty Company of New York instituted a motion for judgment proceeding in the Circuit Court of Wyoming County against Donald W. McNamara, a former police officer of the City of Princeton, to recover the sum of seven hundred fifty dollars based upon an indemnity agreement contained in defendant's written application for an official bond furnished to the City·of Princeton upon which plaintiff was surety. The circuit court overruled plaintiff's demurrer to the evidence interposed at its conclusion, and entered judgment *nil capiat* against plaintiff, who prosecutes this writ of error.

The pertinent provisions of the application upon which this proceeding is based read:

"I hereby apply to The Fidelity and Casualty Company of New York, hereinafter called the Company, for a Bond in my behalf as above described. I also hereby agree for myself, my heirs, executors and administrators, as follows: (1) To indemnify the Company against any losses, damages, costs, charges, or expenses it may sustain, incur or become liable for in consequence of the said Bond, or any renewal thereof, or any new bond issued in continuation thereof or as a substitute therefor; (2) that any proper evidence of the payment by the Company of any such

losses, damages, costs, charges, or expenses shall be conclusive evidence against me, my heirs, executors, and administrators, of the fact and extent of my liability to the company under this agreement."

On December 16, 1939, while the bond was in force, defendant and one Simms, another police officer of the City of Princeton, entered a pool room, in which one Hershel Robinette was seated in a chair in an intoxicated condition but creating no disturbance, arrested and took him to jail. When the officers proceeded to make the arrest, Robinette exhibited some reluctance to submit, and a scuffle ensued during which Robinette was injured by being thrown violently on a pool table. Simms took hold of Robinette and threw him on the pool table. Both officers participated in the scuffle. Defendant says that he did not strike Robinette, but was simply helping to get Simms and Robinette parted and "was trying to keep Robinette from hitting Simms in the head, trying to keep him from hitting him with pool balls." One Hilden Holt, who was present in the room at the time, stated that while Simms was holding Robinette down on the pool table, defendant struck Robinette across the legs two or three times with his nightstick. Robinette was then led out of the room and taken to jail. He later brought an action against the defendant on his bond. When the case was called for trial, defendant was in the court room, but before trial the surety company, without consulting him, settled the claim for two hundred fifty dollars.

On another occasion, early in the evening of August 31, 1940, defendant and one Shields, a fellow-officer, arrested two teen-age boys, Eddie Wingate and Tommy Clark, on a charge of reckless driving. Shortly before the arrest the boys were riding in an automobile which overturned without any other vehicle being involved. Immediately following this they ran, pursued by both officers, and young Wingate sought refuge in a small tree. Upon being persuaded to come down, he was struck several times without provocation by one or both of the

officers and severely injured. Defendant denies that he struck Wingate. However, he admits that Shields did, but says he did not see where the blows were directed because of darkness. Wingate's father employed counsel, and plaintiff's attorney settled this claim without consulting defendant by paying two hundred fifty dollars to Wingate's guardian. In addition plaintiff incurred and paid attorneys' fees and expenses in the Robinette case in the amount of $87.50 and $97.00 in the Wingate case.

Plaintiff's counsel filed a statement without objection in lieu of testimony, to the effect that, after having caused investigations to be made in both cases, he was convinced that there was probable liability, and in any event the cost of defending the cases would exceed the expenditures involved in the settlements.

Defendant's counsel says that the conclusive evidence clause in the second part of the instant contract is invalid as against public policy and violative of the due process clauses of the United States and West Virginia Constitutions, and that the invalidity of the clause vitiates the entire contract. It is contended, as was held in *Fidelity & Deposit Company of Maryland* v. *Davis,* 129 Kan. 790, 284 P. 430, 68 A. L. R. 321, that such clause in an indemnity contract is contrary to public policy because it "pares down the functions of the court," and makes the court "simply an automaton, to do the thing which the parties agree shall be done." The question is novel in this jurisdiction; but by the decided weight of authority the clause has been upheld where the contract contains a provision that the surety exercised good faith in effecting settlements. *Standard Accident Insurance Co.* v. *Fell,* (La. App. Ct.) 2 So. 2d 519; *National Surety Co.* v. *Fulton,* 192 App. Div. 645, 183 N. Y. Supp. 237; *Guarantee Co. of North America* v. *Pitts,* 78 Miss. 837, 30 So. 758; *Peay* v. *Southern Surety Co.,* 141 Ark. 265, 216 S. W. 722. See collation of authorities in annotation to *Fidelity & Deposit Company of Maryland* v. *Davis, supra.*

It is to be noted, however, that the instant contract contains no express provision requiring that good faith

must be exercised by the surety in effecting the settlement of liability on the bond, and where no such provision is incorporated in the contract the courts have divided into three lines of authority: (1) The contract has been held invalid as against public policy (*Fidelity & Deposit Company of Maryland* v. *Davis, supra; Fidelity & Casualty Co. of New York* v. *Eickhoff,* 63 Minn. 170, 65 N. W. 351); (2) in *Fidelity & Casualty Co. of New York* v. *Harrison,* (Tex. Civ. App.) 274 S. W. 1002, the court held that a provision that good faith must be exercised by the surety in effecting settlements should be read into the agreement by the court and the contract upheld; and (3) the conclusive evidence clause has been treated as making the voucher or other evidence of payment by the surety *prima facie* evidence of the principal's liability, and the contract has been upheld on that basis.

We think the rule established in the case of *Fidelity & Casualty Co. of New York* v. *Harrison, supra,* in which the court read into the contract a good faith provision, should be adopted in this jurisdiction. For this Court to hold that a contract, such as we have here, is wholly void would place surety companies at the mercy of *insolvent* and arbitrary principals. Such holding would be dangerously apt to prevent surety companies from doing business in this State at the present rates. On the contrary, if we should hold that the vouchers representing payment instead of being conclusive evidence are simply *prima facie* evidence, without reading into the contract the good faith requirement, a *solvent* principal on a surety bond would run the risk of having a surety company, either through carelessness or actual bad faith, make an unreasonable settlement disadvantageous to the principal. In such a case the surety would have nothing to lose by an unfavorable settlement. It would simply be dealing with the principal's money without regard to the principal's interest and without any risk to itself.

To a large extent the problem is social. We are well aware, as counsel for plaintiff suggests, that surety companies are wont to exercise good faith in the settlement of liability under their contracts. We are not, however,

concerned with that in this case. There must be withheld from them the opportunity to make settlements binding upon the principal and without the exercise of good faith. On the other hand there must be withheld from the principal on a surety bond the right to refuse arbitrarily to agree to a reasonable settlement made in good faith. The conflicting interests between principal and surety under a contract of suretyship such as we have at bar must be solved in the public interest, which requires that the parties be protected against possible wrongdoing of each other, and that can only be done by reading into the contract a provision that good faith be exercised by the surety, which we think should be done in the instant case. This renders moot the question whether the conclusive evidence clause is severable from the other parts of the agreement.

It then becomes necessary for us to decide whether plaintiff, in fact, exercised good faith. The statement filed by plaintiff's counsel in lieu of testimony is uncontradicted. He is a reputable member of the bar of this Court, and his opinion was given after thorough examination and is based upon his professional experience. So, notwithstanding plaintiff's demurrer to the evidence, the statement must be taken as true, and it must be said that the claims rendered plaintiff open to probable liability, and that the settlements were reasonable in that the cost of litigation probably would have exceeded the amounts involved in the two settlements. Nevertheless, in our opinion, plaintiff did not fulfil its full duty under the contract. Though defendant was available, the surety company did not consult with him about the proposed settlements before concluding them. If such consultation had been had and defendant had taken an arbitrary view in refusing to consent to reasonable settlements, plaintiff would have been free to effect such settlements without waiving its right in the indemnity agreement. The advisability of requiring that the principal be consulted concerning a proposed settlement lies in the fact that cases may arise where the principal's reputation is in-

volved, as was the situation in *Fidelity & Deposit Co. of Maryland* v. *Davis, supra.*

For the foregoing reasons we are of opinion that the judgment of the circuit court should be affirmed.

*Affirmed.*

KENNA, JUDGE, concurring:

Contracts should be construed to be enforceable and not against public policy where that can be done without violating their terms. I think that in this instance that not only can be done, but, under the rule of strict construction against the draftsman, here plainly the paid surety, is unavoidable. To say that "any proper evidence of payment" by the surety "of any such losses, damages, costs, charges, or expenses" shall be "conclusive" as against the principal and his successors, clearly leaves open the question of what *actually are* "losses, damages, costs, charges, or expenses." In order to charge the principal, the surety must show that what it has paid properly falls within that classification, in nature, which includes amount. It cannot recover as against the principal by simply showing, as it did here, that it has paid out certain moneys that it has decided are within the named classification and charged to his account. I believe that to so hold would be to plainly misread the contract contained in the application, and, furthermore, to maintain a principle properly held by many courts to be against public policy. To hold that the surety can acquire by contract the legal right to arbitrarily settle for whatever amount it wishes and recover the same amount from the principal, would certainly open a tempting field to chicanery. That, public policy does not permit. I question the soundness of the theory of public policy discussed in *Fidelity & Deposit Company* v. *Davis*, 129 Kan. 790, 284 P. 430, 68 A. L. R. 321, because the so called "ousting" of the jurisdiction of the courts, phrased differently, in a broad sense might include the avoidance of litigation as is done by arbitration and award. That device is to prevent litigation: not to oust the jurisdic-

tion of the courts. I would rather say that the so called "conclusive evidence clause" now before us, unless strictly construed as I first suggest in order to make it enforceable, is against public policy for the reason that it leads to oppression and is against good morals.

I concur in the Court's conclusion.